# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | No. 07-10061-MLB |
| | ) | |
| OSCAR ROCHIN-GERMAN, | ) | |
| JORGE ALBERTO ROCHIN, and | ) | |
| SONJA TONEVA ROCHIN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the court on defendants' motions to suppress. (Docs. 29, 32, 34, 37.)  The motions have been briefed (Docs. 36, 41) and the court conducted an evidentiary hearing on June 11 and 18, 2007.  The motions to suppress are DENIED for the reasons stated herein.

Also before the court are defendant Jorge Alberto Rochin's motion for severance (Doc. 28) and motion to dismiss the indictment (Doc. 30).  The government responded to both motions separately (Docs. 43, 44).  The motion for severance and the motion to dismiss are DENIED for the reasons stated herein.

All defendants have been indicted with the following: Count 1) conspiracy to distribute cocaine (21 U.S.C. § 846); Count 2) possession with the intent to distribute cocaine (21 U.S.C. § 841(a)(1)) and aiding and abetting the same (18 U.S.C. § 2); and Count 3) interstate and foreign travel in aid of racketeering enterprises (18 U.S.C. § 1952(a)(3)) and aiding and abetting the same (18 U.S.C. § 2).  (Doc. 15.)

## I.   FACTS

This case arises from a traffic stop late on the night of March 14, 2007 and into the early morning of March 15, 2007.  Hank Cocking, a deputy sheriff with the Sedgwick County Sheriff's Department in his sixteenth year with the department, approached the patrol car of Eddie Padron, a police officer with the City of Wichita, as Padron was working a traffic stop on Interstate 35.  Interstate 35 is a four-lane, divided highway, with shoulders on both the inside and outside lane.  A concrete barrier separates the northbound traffic from the southbound traffic.  Padron's patrol car was stopped, with its emergency lights activated, on the outside shoulder of the northbound lanes.

Upon approaching Padron, Padron informed Cocking that he did not need assistance with his traffic stop.  Cocking moved his patrol car approximately 300 feet behind Padron to observe.  Cocking then saw a 2003 Ford Explorer approach Padron's patrol car in the outside lane without moving to the inside lane or braking to slow its speed.  Cocking thought the vehicle did not have a tag affixed.  No other traffic was on the roadway that would have prohibited the vehicle from moving to the inside lane.

When the rear of the vehicle was at the midpoint of Padron's patrol car, the vehicle straddled the broken line dividing the inside and outside lanes of traffic for approximately 200 feet.  The vehicle then activated its signal and moved to the inside lane.  At this point, Cocking pulled out and pursued the vehicle.  Cocking then observed the vehicle make a sharp move to the yellow line separating the inside lane from the inside shoulder and concrete barrier.  The

-2-

vehicle's two driver's side tires hit the yellow line but did not cross the yellow line.  The vehicle jerked back into the inside lane with a sudden, quick movement.  Cocking could see at this point that the vehicle had a paper tag.

Cocking activated his lights and pulled over the vehicle. Cocking thought the vehicle had violated the Kansas statutes requiring vehicles to move over and slow down for emergency vehicles,[1] signal before changing lanes,[2] and drive within its lane of traffic.[3] Cocking also thought the driver of the vehicle might have been impaired or sleepy.

Cocking approached the driver's side window of the vehicle and made contact with Sonja Toneva Rochin.  Sonja rolled down the window and immediately began remarking how cold it was, despite having just rolled down the window and having the heater on inside the vehicle. Cocking testified that the temperature that night was forty to fifty degrees, with little or no wind, and that it was dark but illuminated by street lights.  Sonja was also acting nervous.  Cocking was suspicious of this behavior because Cocking had a similar situation occur recently: A driver in the same general area rolled his window down when Cocking approached and was nervous and overreacting to the

---

[1]   K.S.A. § 8-1530(b)(1) (stating that upon approaching a stationary emergency vehicle with its visual signals activated, a driver on a four-lane road shall proceed with due caution and change lanes if practicable).

[2]   K.S.A. § 8-1548(a) (requiring use of a signal before moving right or left upon a roadway); 8-1548(b) (requiring the signal to be given continuously during and not less than one hundred feet before turning).

[3]   K.S.A. § 8-1522(a) (requiring vehicles to be driven entirely within a single lane).

-3-

temperature, despite having his heater on.  Cocking ultimately found narcotics in that vehicle.

Cocking asked Sonja for her driver's license and vehicle registration.  As Sonja was gathering her documents for Cocking, Cocking asked Sonja where she was coming from.  Sonja told Cocking she had spent the last seven days in Tucson, Arizona visiting her mother and was traveling home to Des Moines, Iowa.  Cocking recognized that Tucson is a "hot-spot" for narcotics.

Sonja told Cocking she had driven a 2002 Ford Explorer down to Tucson but had left the vehicle with her mother, and her mother was now driving the vehicle.  Sonja told Cocking her husband, the passenger in the front seat later identified as Oscar Rochin-German, had purchased the vehicle she was now driving.  Cocking tried to talk to Oscar, but Oscar spoke no English.  Cocking noticed a passenger in the rear of the vehicle, later identified as Jorge Alberto Rochin,[4] lying with a pillow over his head.  Jorge never sat up or looked directly at Cocking, but would occasionally take quick peaks at Cocking.  Cocking also saw a small child in the seat behind the driver.

Sonja gave Cocking her driver's license and a 90-day registration for the vehicle but could not provide a bill of sale for the vehicle. The vehicle was registered in Sonja's name with an issue date of January 30, 2007 and an address in Des Moines, Iowa.  Sonja could not relate how much she had paid for the vehicle.  Cocking returned to his

_____

[4]   In their briefing, the parties refer to Jorge as Oscar's brother, but this fact was never put into evidence at the hearing on the motions to suppress.  Padron did testify that he was told that Jorge lived with Oscar and Sonja in Des Moines, Iowa.

patrol car after receiving Sonja's documentation.

Cocking called for Padron, who was still in the area, to come and assist.  (Padron speaks Spanish and could assist in communicating with the passengers in Sonja's vehicle.)  When Padron arrived, Cocking asked him to make contact with Oscar.  Cocking ran a records check on Sonja and found a previous violation for transporting illegal aliens across the border.

Padron spoke with Oscar and verified that he was Sonja's husband.[5]  Oscar told Padron that they had just spent fifteen days in Tucson and had paid fifteen thousand dollars in cash for their current vehicle because they had wrecked the 2002 Ford Explorer.  Oscar told Padron that the 2002 vehicle was not driveable.

Cocking re-approached Sonja and asked her for her correct current address because different addresses were used on her driver's license and registration.  Sonja informed Cocking that her previous criminal violation occurred when she was driving across the border with her husband's sister.  Sonja again stated that the 2002 vehicle that had been left with her mother was in a driveable condition.

Cocking and Padron spoke and decided that because of the continuing conflicting stories, they would ask Sonja and Oscar for consent to search the vehicle.  Cocking re-approached Sonja and asked her to step out of the vehicle, right outside her door, with her door remaining open.  Cocking returned all Sonja's documentation to her and

---

[5]   At the hearing on the motions to suppress, the marriage license of Oscar and Sonja was introduced without objection.  The government does not appear to challenge the fact that Oscar and Sonja were husband and wife at the time all incidents related herein occurred.

-5-

asked Sonja if she had everything.  Sonja replied "Yes."  Cocking stated "that's all I have for you.  Have a good evening."  Cocking paused and then asked Sonja if he could search her vehicle.  Sonja replied "Yes" and seemed happy to let Cocking search her vehicle.  At the time Sonja gave her consent to search, Oscar was standing outside the vehicle speaking with Padron.

At the same time Cocking asked Sonja for consent to search, Padron was asking Oscar for consent to search.  Padron first returned Oscar's identification card to Oscar and told him he was "good to go." Oscar took a step toward his vehicle and then Padron asked Oscar if he had anything illegal.  Oscar replied "No, but you can search if you want."  Padron then expressly asked if he could search the vehicle. Oscar replied "Yeah."  Neither Padron nor Cocking had a conversation with Jorge at the time of the stop.

Cocking and Padron removed all the occupants from the car to the ditch with a blanket for the child.  Both Cocking and Padron hand-searched the vehicle.  When Cocking and Padron looked around the molding of the roof of the vehicle, Sonja gave over-exaggerated coughs.  Sonja asked for cough medicine, which was given to her. Sonja then informed Cocking and Padron she was having an asthma attack, and EMS was called for her.  (EMS did not ultimately transport Sonja after treating her and she was left in Padron's custody.)  Sonja and the child were placed in Padron's patrol car so they would be more comfortable.

Cocking noticed that the molding on the vehicle was down a little bit and looked altered from its factory made condition.  Cocking and Padron ultimately found twenty kilo-sized bricks of a white, powdery

-6-

substance, later identified as cocaine, stored in boxes strapped to the ceiling inside the headliner of the vehicle.  Padron testified that cocaine in Wichita, Kansas sells for eighteen to twenty thousand dollars per kilo and, in his experience dealing with traffic stops where large amounts of narcotics have been found, the adult passengers in the vehicle have been aware of the presence of narcotics so that the passengers know what not to say to police if the vehicle is stopped.  In the vehicle, Cocking and Padron also found a certificate of title, an insurance card, and a title application for other vehicles, all in Oscar's name.

The entire length of the incident took fifty-nine minutes.  The initial stop and records check took twenty-one minutes.  From the time Sonja and Oscar gave their consent to search at twenty-one minutes into the stop, it took Cocking and Padron thirty minutes to search the vehicle before they found the non-factory headliner and another eight minutes to locate the boxes containing the kilos of cocaine.  Throughout the search, Sonja, Oscar and Jorge did not ask Cocking and Padron to stop searching.

Sonja, Oscar and Jorge were transported to the Sheriff's Department.  As Padron started to drive away from the traffic stop with Sonja in his vehicle, Sonja stated that she needed to talk to Padron to calm her nerves.  Sonja expressed her fears about her child being taken from her.  Padron replied only that he could not do anything for her but that she should cooperate.  Sonja told Padron that she was glad he and Cocking got the cocaine because cocaine had ruined her ex-husband.

Padron does not recall ever telling Sonja that he and Cocking

-7-

found cocaine.  Sonja had been in Padron's patrol car throughout the discovery of the cocaine and Cocking did not have any contact with Sonja after the cocaine was found.  Sonja could not have seen what was removed from the vehicle because Padron's patrol car was two cars away from the vehicle[6] and when Cocking pulled a kilo brick out of the vehicle and tested it, his back was to the patrol cars.

Oscar and Jorge invoked their <u>Miranda</u> rights and did not speak nor give a written statement.  Once Oscar was booked into custody, approximately $692 was found on his person.  Once Jorge was booked into custody, approximately $1442 was found on his person.  Jason Whipple, the case agent for the government, testified that both Oscar and Jorge are in the United States illegally, but that Sonja is a United States citizen.

Neither Sonja nor Jorge testified at the hearing on the motions to suppress.  Oscar, however, testified that he knew of the presence of the cocaine in the vehicle but that Sonja and Jorge did not.  Oscar testified that he was transporting the vehicle to Iowa with the cocaine in exchange for $5000 from a man he identified as "Compa." Oscar testified that he, Sonja, and Jorge wrecked their 2002 Explorer on the way to Tucson, arrived in Tucson on March 1 by bus with the 2002 Explorer being towed to Tucson by a wrecking company.  Oscar initially testified that Compa gave him the 2003 Explorer on March 11 or 12 and Oscar put the vehicle in his wife's name on the date he got the vehicle.  Oscar later testified, upon reviewing the Arizona permit

---

[6] Cocking testified that officers park a patrol car six to eight feet behind the vehicle being stopped for safety reasons.  Padron's patrol car was then parked behind Cocking's patrol car.

for the 2003 Explorer, that he had arranged for Compa to register the vehicle in Sonja's name before traveling to Tucson and that he had traveled to Tucson for the purpose of bringing back the narcotics.

## II.  MOTIONS TO SUPPRESS

A.  Sonja Toneva Rochin

Sonja moves the court for an order suppressing all evidence obtained on March 15, 2007.  (Doc. 34)  Sonja alleges that her initial seizure was unlawful because there "was no traffic violation."  (Doc. 36 at 7.)  Sonja also alleges she was detained beyond the permissible scope of the traffic stop without reasonable suspicion that a crime had occurred or was occurring.  (Doc. 36 at 9.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Supreme Court has liberally interpreted "seizures" to encompass routine traffic stops, "even though the purpose of the stop is limited and the resulting detention quite brief."  See Delaware v. Prouse, 440 U.S. 648, 653 (1979).  "Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest," the stops are analyzed under the principles articulated in Terry v. Ohio. United States v. King, No. 05-6399 (10th Cir. Dec. 18, 2006).  The two-pronged standard espoused in Terry v. Ohio, 392 U.S. 1 (1968), thus applies, see United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001), and renders a traffic stop reasonable if "the officer's action was justified at its inception, and [if] it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.

An initial traffic stop is justified at its inception if it was "based on an observed traffic violation," or if "the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998). The evidence, which is essentially uncontroverted, showed that several violations occurred. The court finds Cocking's testimony credible that he observed Sonja fail to move to the inside lane upon approaching Padron's patrol car with its lights activated. The court also finds Cocking's testimony credible that Sonja failed to maintain a single lane of traffic when she straddled the center dotted line for two hundred feet after the rear of her vehicle reached the middle of Padron's patrol car. The court further finds Cocking's testimony credible that Sonja drifted onto the yellow line and jerked her vehicle back into the her lane of travel, all of which could have been an indication of a sleepy or impaired driver. Cocking was justified, for many reasons, in stopping Sonja's vehicle.

Even when the initial stop is valid, however, any investigative detention must not last "longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). An officer "conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). The uncontroverted testimony shows that Cocking approached Sonja's window and asked for her driver's license and registration. Cocking made conversation with Sonja about her travel plans, but this occurred only while Sonja was gathering her documents. Cocking returned to his car and requested Padron's assistance because he was

-10-

unable to speak to the passengers in Sonja's vehicle. Cocking ran a records check on Sonja, and Padron arrived while this records check was being completed. Cocking then re-contacted Sonja, but only to resolve a discrepancy in her addresses on the documents she had given him. Cocking briefly spoke with Padron and then returned Sonja's documents to her and informed her that it was all he had for her. The time of the stop lasted only twenty-one minutes. Therefore, the scope of the traffic stop was reasonably related in scope to the circumstances which initially justified the interference. Terry, 392 U.S. at 20.

After the purpose of the traffic stop is complete, however, "further detention for purposes of questioning unrelated to the initial stop" is generally impermissible. Bradford, 423 F.3d at 1156-57. In general, "lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." Hunnicutt, 135 F.3d at 1349. The court finds that the further questioning of Sonja to obtain Sonja's consent to search was consensual.[7]

---

[7] Because the court finds that the initial detention had become a consensual encounter, it need not also find that Cocking had an objectively reasonable and articulable suspicion of illegal activity. The court makes the additional finding, however, that reasonable suspicion did exist. Sonja was nervous upon approach and continuously over-reacted to the outside weather conditions which was a similar

"If an encounter between an officer and a driver ceases to be a detention and becomes consensual, and the driver voluntarily consents to additional questioning, no further Fourth Amendment seizure or detention occurs." Bradford, 423 F.3d at 1158. "A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). "Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." Id. The Tenth Circuit follows a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned." Bradford, 423 F.3d at 1158. "The return of a driver's documentation is not, however, always sufficient to demonstrate that an encounter has become consensual. A routine traffic stop becomes a consensual encounter once the trooper has returned the driver's

---

reaction to a narcotics stop Cocking had recently been involved in. She was traveling from Tucson, Arizona in a car for which she had no bill of sale. She had a previous conviction for transporting illegal aliens. When Padron arrived to converse with Oscar to confirm he was Sonja's husband, Oscar gave a conflicting story regarding the length of their trip, their reason for purchasing a new vehicle, and the status of their former vehicle. In addition, Jorge acted suspiciously by not sitting up despite being awake and taking only quick looks at Cocking without looking Cocking in the eyes. All of this amounted to reasonable suspicion of illegal activity. See United States v. Arvizu, 534 U.S. 266, 273, 277 (2002) (stating that a court should look to the "totality of the circumstances" to determine if an officer has a "particularized and objective basis for suspecting legal wrongdoing" and that reasonable suspicion mat exist even if each factor alone is "susceptible of innocent explanation").

documentation so long as a reasonable person under the circumstances would believe [they] were free to leave or disregard the officer's request for information." Id. (internal quotations and citations omitted).

The court accepts Cocking's testimony that he returned Sonja's driving documents to her before asking her for consent to search her vehicle. Sonja was given her driver's license and registration and was asked whether she had everything. Sonja responded affirmatively. Sonja was advised that Cocking had nothing more for her and was told to have a good evening. Only then was Sonja asked if Cocking could have permission to search her vehicle. There is no indication that Cocking made any "coercive show of authority" such that a reasonable person would not have felt free to leave. See United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991) (discussing factors for finding a "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled"). The court therefore finds that the traffic stop had become a consensual encounter.

Because the search that occurred on March 15, 2007 was a warrantless search, the government bears the burden of proving by a preponderance of the evidence that the search was justified. United States v. Zubia-Melendez, 263 F.3d 1155, 1160 (10th Cir. 2001). The government must prove that consent to search was given voluntarily and that there was "no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." United States v. Sanchez-Valderuten, 11 F.3d

-13-

985, 990 (10th Cir. 1993).  Whether a party has voluntarily consented
is evaluated based on the totality of the circumstances.  United
States v. West, 219 F.3d 1171, 1177 (10th Cir. 2000).  The court finds
that Sonja's response to Cocking's question asking for permission to
search was an unqualified "Yes" which made the search of Sonja's
vehicle consensual.  Therefore, the search of Sonja's vehicle without
a warrant did not offend Fourth Amendment principles.

The statements Sonja made to Padron while she was being
transported were also not offensive to constitutional principles.
Statements that are volunteered and not made in response to any
question by the officer do not fall under Miranda and are admissible.
See Miranda v. Arizona, 384 U.S. 436, 478 (1966) ("The fundamental
import of the privilege [against compelled self-incrimination] while
an individual is in custody is not whether he is allowed to talk to
the police without the benefit of warnings and counsel, but whether
he can be interrogated. . . . Volunteered statements of any kind are
not barred by the Fifth Amendment . . ."); see also United States v.
Mullen, 95 Fed. Appx. 259, 260 (10th Cir. 2003) ("The Fifth Amendment
does not bar the admission of volunteered statements which are freely
given."); cf United States v. Rambo, 366 F.3d 906, 909-10 (10th Cir.
2004) (holding that a conversation can amount to an interrogation,
even when the officer does not ask questions, when the officer "should
know" that his or her words or actions "are reasonably likely to
elicit an incriminating response" (citing Rhode Island v. Innis, 446
U.S. 291, 301 (1980))).  Sonja does not contend that her statements
to Padron were not made voluntarily or were coerced under the due-
process standard for admission of statements.  See Dickerson v. United

-14-

States, 530 U.S. 428, 433 (2000) (stating the due-process standard for confessions as whether a defendant's will was overborne).  The court finds that Sonja's statements were volunteered to Padron and admissible.[8]

---

[8] Once Sonja was at the Sedgwick County Sheriff's Department, she was placed in an eight foot by eight foot interview room which contained a table and three chairs.  Sonja was not restrained. Matthew Lynch, a detective with the Sedgwick County Sheriff's Department introduced himself to Sonja and filled out an interview sheet with her.  Lynch then read Sonja her Miranda rights, which Sonja initialed that she understood.  Sonja then signed a waiver of her rights.  Lynch testified that Sonja was not sleepy at the time she waived her Miranda rights and clearly spoke and understood English. Lynch and Sonja had a lengthy discussion about Sonja's travels from Iowa to Arizona and from Arizona to Wichita.  Once Lynch spoke to Sonja about the vehicle she was driving from Tucson to Wichita being registered in Sonja's name, Sonja became emotional and Lynch stopped interviewing Sonja.

Sonja filed a second motion to suppress (Doc. 37) which sought exclusion of these statements from Sonja to Lynch.  At the conclusion of the hearings on these matters, Sonja withdrew her second motion to suppress.  Because the first motion encompasses "any and all evidence derived from" the initial stop, Sonja's first motion may be read to challenge Sonja's statements to Lynch.

To the extent Sonja continues to challenge these statements, her motion is denied.  The statements Sonja made to Lynch while being interviewed were given voluntarily after Sonja waived her Miranda rights.  A Miranda waiver is valid when it is given voluntarily, knowingly, and intelligently.  Miranda v. Arizona, 384 U.S. at 444. To be voluntary, a statement must be the product of a rational intellect and free will.  Townsend v. Sain, 372 U.S. 293, 307 (1963). Therefore, a statement is admissible when it is given freely and voluntarily, after a knowing and intelligent waiver of one's constitutional rights.  Jackson v. Denno, 378 U.S. 368, 385-86 (1964). A finding of involuntariness requires a finding of coercive police action.  Colorado v. Connelly, 479 U.S. 157, 167 (1986).

Not only does the court accept as true that Sonja was read her Miranda rights and subsequently waived them, the court also finds the statements Sonja made were voluntarily given.  The court finds that Lynch, the interrogating officer, did not intimidate Sonja and Sonja was not susceptible to police coercion.  Sonja was questioned only by one officer.  Sonja was not visibly fatigued and the interview was ended when Sonja became emotional.  Sonja's challenge to the voluntariness of her statements is without merit.  See United States v. Chalan, 812 F.2d 1302, 1308 (1987) (finding police conduct non-coercive when the defendant was advised of his Miranda rights before questioning, the interview was not excessively long, the environment was not coercive because, even though some officers were armed, the

As a result of the above analysis, Sonja's motion to suppress is denied.

B.   Oscar Rochin-German

Oscar moves the court for an order suppressing the evidence obtained March 15, 2007.  (Doc. 32.)  Oscar alleges that no reasonable suspicion existed to prolong his detention at the traffic stop and that he did not give his voluntary consent to prolong the stop.  (Doc. 33 at 6.)

Oscar either purchased the vehicle his wife was driving or was given the vehicle by the man he identified as Compa, thereby giving him standing to challenge the search of the vehicle.  See Rakas v. Illinois, 439 U.S. 128, 148-49 (1978) (holding that a passenger must have a property or possessory interest in an automobile in order to have standing to challenge the seizure of contraband from that automobile).  As discussed above, a traffic stop must end when its purpose is complete, unless the officer has a reasonable, articulable suspicion of illegal activity or the initial detention has become a consensual encounter.  Hunnicutt, 135 F.3d at 1349.

The court finds that the further questioning of Oscar to obtain Oscar's consent to search the vehicle was consensual.  The court accepts Padron's testimony that he returned Oscar's identification to him and told Oscar he was "good to go."  A reasonable person would have felt free to leave at that point.  West, 219 F.3d at 1176; Bradford, 423 F.3d at 1158.  In fact, Oscar did turn to leave and took

---

defendant's mother was present and the defendant was not physically threatened, the defendant had previous experience with law enforcement procedures, and the defendant was not "unusually susceptible to coercion because of his age or lack of education or intelligence").

a step away from Padron.  Only at that point did Padron ask Oscar if there was anything illegal in the vehicle.

The court additionally finds that Oscar's consent to search was given voluntarily, freely and intelligently, and without coercion. See Sanchez-Valderuten, 11 F.3d at 990.  Whether a party has voluntarily consented is evaluated based on the totality of the circumstances.  United States v. West, 219 F.3d 1171, 1177 (10th Cir. 2000).  The court finds that Oscar's response to Padron's question of whether there was anything illegal in the vehicle with an offer that Padron could search if he wanted, and Oscar's additional affirmative "yes" to the direct question of whether Padron could search the vehicle, made the search of the vehicle consensual.  As a result, the March 15 stop did not offend Fourth Amendment principles and Oscar's motion to suppress is denied.

C.  Jorge Rochin

Jorge moves the court for an order suppressing the physical evidence obtained March 15, 2007. (Doc. 29 at 1.)  Jorge alleges the evidence was obtained as the result of "unreasonable and unconstitutional seizures which infringed upon Jorge's reasonable expectation of privacy in his person." (Doc. 29 ay 2.)  Jorge alleges his rights under the Fourth and Fourteenth Amendment were violated when: 1) the vehicle he was riding in was seized without probable cause or reasonable, articulable suspicion that a crime had occurred; and 2) even assuming the initial seizure was valid, his continued detention exceeded the scope of the initial detention and rendered his seizure unreasonable.  (Doc. 29 at 4.)  As a result of these violations of his constitutional rights, Jorge alleges that the

-17-

evidence discovered should be suppressed as "fruits of the poisoned tree." (Doc. 29 at 5.)

The Supreme Court recently affirmed Tenth Circuit precedent holding that a passenger is seized, for purposes of the Fourth Amendment, when the vehicle in which he is the passenger is stopped for a traffic violation. Brendlin v. California, ___ U.S. ___, 2007 WL 1730143 (June 18, 2007); United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989). As a result, Jorge has standing to challenge his seizure.

As discussed above, the court finds that the vehicle Jorge was riding in was properly seized by Cocking when Cocking visually observed what he believed was the violation of three Kansas driving statutes. United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (holding that an initial traffic stop is justified at its inception if it was "based on an observed traffic violation," or if "the officer has a reasonable articulable suspicion that a traffic . . . violation has occurred").

Further, the court has found that the detention of the vehicle was reasonable in scope. Terry v. Ohio, 392 U.S. at 20 (holding that a traffic stop is reasonable if the "officer's action was justified at its inception, and [if] it was reasonably related in scope to the circumstances which justified the interference in the first place"). Finally, both the driver and passenger of the vehicle Jorge was riding in consented to the search of the vehicle and, therefore, continued detention of the vehicle and its passengers was reasonable. See Maryland v. Wilson, 519 U.S. 408, 414-15 (1997) (police officers may order both the driver and passengers to exit a vehicle during a

-18-

traffic stop).

Because there were no violations of Jorge's constitutional rights (i.e., although Jorge was seized, the seizure was not unconstitutional), there is no reason to suppress any evidence as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 484 (1963) (requiring exclusion of evidence obtained through an illegal search); cf United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000) (holding that "although a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the *illegal* detention") (emphasis added); United States v. DeLuca, 269 F.3d 1128, 1133 (10th Cir. 2001) ("In order to meet his initial burden under Nava-Ramirez and demonstrate the required factual nexus, [a defendant] must show that the [contraband] would never have been found but for *his*, and only his, unlawful detention."); United States v. Ladeaux, 454 F.3d 1107, 1111 n.4 (10th Cir. 2006) (stating that the nexus requirement of Nava-Ramirez is applicable in cases "where the illegality complained of is not a search (to which the defendant lacks standing to object) but an illegal detention of that non-owner defendant").

Jorge's motion to suppress is therefore denied.

## III.   MOTION FOR SEVERANCE

Jorge moves, pursuant to Federal Rule of Criminal Procedure 14, that his trial be severed from that of his codefendants Oscar and Sonja.  (Doc. 28.)   Joint trials of defendants who are indicted together are preferred.  United States v. Hall, 473 F.3d 1295, 1301

-19-

(10th Cir. 2007). Rule 14(a) permits severance of a trial of defendants indicted jointly when the joint trial would result in prejudice. As stated by the Supreme Court in Zafiro v. United States:

> [A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.

506 U.S. 534, 539 (1993) (internal citations omitted). The Zafiro Court went on to explain:

> For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as we indicated in Richardson v. Marsh, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

Id. Jorge alleges prejudice based on: 1) the spillover effect onto his case of the evidence against Sonja and Oscar; and 2) the antagonistic defenses of Jorge from Sonja and Oscar. Jorge offers no factual support for his motion to sever. (Doc. 28.)

"[A] defendant cannot obtain severance simply by showing that the

-20-

evidence against a codefendant is more damaging than the evidence against [him]self." United States v. Dazey, 403 F.3d 1147, 1165 (10th Cir. 2005). "Defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540.

Jorge's motion for severance based on prejudice because he is "less culpable" must fail. Here, the indictment charges a simple conspiracy involving few actors and a straightforward set of events. Complexity and confusion of defendants and evidence are not a concern. See Zafiro, 506 U.S. at 539 (finding the risk of prejudice heightened when "many defendants are tried together in a complex case"). A defendant cannot meet his burden of establishing prejudice "by complaining he is 'less culpable,' by alleging he 'would have a better chance of acquittal in a separate trial,' or by complaining of 'the spill-over effect of damaging evidence presented against [his codefendants].'" United States v. Leon, 47 Fed. Appx. 539, 542 (10th Cir. 2002) (quoting United States v. Iiland, 254 F.3d 1264, 1269-70 (10th Cir. 2001)).

Jorge also moves to sever based on antagonistic defenses. "When considering a motion for severance [based on antagonistic defenses], a trial court engages in a three step inquiry. First, it must determine whether the defenses presented are so antagonistic that they are mutually exclusive." United States v. Pursley, 474 F.3d 757, 765 (10th Cir. 2007)(internal quotation omitted). In the Tenth Circuit, "the conflict between codefendants' defenses must be such that 'the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.'" United States v. Linn, 31 F.3d

987, 992 (10th Cir. 1994) (quoting <u>United States v. Swingler</u>, 758 F.2d 477, 495 (10th Cir. 1985)).  "Second, because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence.  Third, if the first two factors are met, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." <u>Pursley</u>, 474 F.3d at 765 (internal quotations and alterations omitted).

Jorge's motion for severance based on antagonistic defenses also must fail.  Jorge simply makes the conclusory statement that the codefendants have antagonistic defenses but alleges only that Sonja and Oscar, as spouses, will protect each other and implicate Jorge. Jorge offers no factual basis for this claim.  In addition, this assertion is directly contrary to the facts adduced at the hearing on these motions, wherein Oscar implicated himself as the possessor of the cocaine and asserted that both Sonja and Jorge had no knowledge of the cocaine's presence in the vehicle.  While the antagonistic defenses would be mutually exclusive under the first step of the analysis outlined above, Jorge has failed to show "serious risk" of prejudice to a "specific trial right" under the second step in the analysis.  <u>Pursley</u>, 474 F.3d at 765.

Jorge has not met his heavy burden to support his motion for severance.  <u>See</u> <u>Hall</u>, 473 F.3d 1295, 1302 (10th Cir. 2007) (quoting <u>United States v. McConnell</u>, 749 F.2d 1441, 1444 (10th Cir. 1984))

(noting that the defendant has a heavy burden of showing real prejudice to his case in supporting a motion for severance). As a result, Jorge's motion for severance is denied.

## IV.   MOTION TO DISMISS

Jorge moves, pursuant to Federal Rule of Criminal Procedure 12(b), (e), to dismiss the indictment against him. (Doc. 30.) A defendant bears a heavy burden in persuading a court to dismiss an indictment:

> An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense. Challenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence. Rather, an indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true. Courts should therefore avoid considering evidence outside the indictment when testing the indictment's legal sufficiency.

United States v. Todd, 446 F.3d 1062, 1067 (10th Cir. 2006) (internal quotations and citations omitted). A challenge to an indictment based on insufficient factual support for the charge is "not the proper inquiry." Id. at 1068. "On a motion to dismiss an indictment, the question is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense. For the most part, that question does not involve any examination of the evidence." Id.

The indictment charges conspiracy to distribute cocaine, possession with the intent to distribute cocaine, and interstate

-23-

travel in aid of the conspiracy and possession with intent to distribute. (Doc. 15.) The indictment alleges that Jorge knowingly, intentionally and unlawfully possessed with intent to distribute approximately 20 kilograms of cocaine, while traveling in interstate commerce on or about March 15, 2007, and that he participated in a conspiracy with regard to the same with Sonja and Oscar. The statutes Jorge is alleged to have violated, 21 U.S.C. §§ 846, 841(a) and 18 U.S.C. § 1952(a)(3), require no more proof than that which the government has charged. Section 846 merely prohibits a conspiracy to violate a narcotics offense; section 841(a) prohibits possession with intent to distribute a controlled substance; and section 1952(a)(3) prohibits travel in interstate commerce with intent to carry on an unlawful activity (i.e., a controlled substances offense).

As a result, Jorge's facial challenge to the indictment fails. Jorge, however, also challenges the indictment based on the sufficiency of the evidence. In "limited circumstances":

> [A] district court may dismiss charges at the pretrial stage where the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case. Pretrial dismissal based on undisputed facts is a determination that as a matter of law, the government is incapable of proving its case beyond a reasonable doubt. Dismissal in this manner is the rare exception, not the rule. Dismissals under this exception are not made on account of a lack of evidence to support the government's case, but because undisputed evidence shows that, as a matter of law, the Defendant could not have committed the offense for which he was indicted.

Todd, 446 F.3d at 1068 (quoting and citing throughout United States v. Hall, 20 F.3d 1084, 1088 (10th Cir. 1994)).

Jorge's challenge to the sufficiency of the evidence supporting the indictment also fails, for several reasons. First, the government objects to the resolution of this matter on the basis of "undisputed facts" (Doc. 44 at 3) which precludes this court from dismissing the charges. See Todd, 446 F.3d at 1068 ("[A] district court may dismiss charges at the pretrial stage where the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case. "). Second, Jorge's challenge fails because he does no more than allege a "lack of evidence to support the government's case," a challenge expressly foreclosed by the Tenth Circuit precedent cited above. Id. ("Dismissals under this exception are not made on account of a lack of evidence to support the government's case.").

Finally, this court cannot say that, as a matter of law, the government could not prove its case. The government contends factual support exists for the crimes charged because of Jorge's "constructive possession" of the cocaine in the vehicle in which he was riding. The government alleges that because of the large amount of cash carried by Jorge when he was stopped, despite Jorge's claimed occupation in lawn maintenance, and the very large street value of the cocaine carried in the vehicle, combined with the unlikelihood of such a valuable commodity being carried in the vehicle across country without the allegedly related adult passengers, who also lived together and traveled on vacation together, being aware of its presence, a conviction based on constructive possession could be sustained. (Doc. 44 at 4-5.)

Constructive possession can form the basis for a charge of possession with intent to distribute narcotics.  <u>See, e.g.</u>, <u>United States v. Ngo</u>, No. 06-6244, 2007 WL 1290157, at *6-7 (10th Cir. May 3, 2007); <u>United States v. Triana</u>, 477 F.3d 1189, 1194 (10th Cir. 2007); <u>United States v. Norwood</u>, 194 Fed. Appx. 573, 578-79 (10th Cir. 2006).  Of course, the government must show some nexus linking Jorge to the cocaine.  <u>See, e.g.</u>, <u>United States v. Valdez-Galleon</u>, 162 F.3d 1256, 1262 (10th Cir. 1998); <u>United States v. Hooks</u>, 780 F.2d 1526, 1531-32 (10th Cir. 1986).  When viewed by the totality of the evidence and the reasonable inferences drawn therefrom, <u>Hooks</u>, 780 F.3d at 1532, a jury could conclude that Jorge's behavior in the back seat of the vehicle when it was pulled over, the amount of cash he was carrying, the very high value of the cocaine in the vehicle, the travel plans Sonja and Oscar related, and Jorge's close relationship to Sonja and Oscar link Jorge to the cocaine.

Jorge's motion to dismiss the indictment against him is accordingly denied.

## V.  CONCLUSION

Defendants' motions to suppress (Docs. 29, 32, 34, 37) are DENIED.  Defendant Jorge Alberto Rochin's separate motions (Docs. 28, 30) are DENIED.  The clerk is directed to set this case for trial.

IT IS SO ORDERED.

Dated this   21st   day of June, 2007, at Wichita, Kansas.

S/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

-26-